IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| MAUREEN HORAN and DENNIS VACHON,<br><br>    Plaintiffs,<br><br>        v.<br><br>DILBET, INC. d/b/a WINDRIFT HOTEL RESORT,<br><br>    Defendant. | Civil Action No. 12-2273<br><br>**OPINION** |

**BUMB**, United States District Judge:

This matter comes before the Court upon Defendant Dilbet, Inc.'s ("Defendant" or the "Windrift") Motion for Summary Judgment. Mot. Summ. J. [ECF No. 120]. On April 7, 2017, this Court held oral argument. Prior thereto, Plaintiffs Maureen Horan and Dennis Vachon ("Plaintiffs") had satisfied this Court – barely – that they could demonstrate to a jury by a preponderance of the evidence that the clams that were delivered to the Windrift did <u>not</u> contain an infective dose of Vibrio at the time of delivery.[1] The Court believed this demonstration

---

[1] The Court has previously recited the facts of this case in its August 26, 2015 Opinion. Aug. 26, 2015 Op. [ECF No. 86]. Because the Court presumes the parties' familiarity with the facts, it does not repeat them here.

1

would occur through the testimony of Plaintiffs' expert witness, Dr. James D. Oliver. Generously granting all inferences in favor of Plaintiffs at summary judgment, this Court construed Dr. Oliver's testimony to be tethered to facts that he would ultimately rely on, such as the temperature of the waters at the time of the harvesting, the place of harvesting, etc. Such facts, he testified, would tend to support his testimony that the clams did not have an infective dose of Vibrio at the time they were harvested and delivered to the Windrift. In the Court's view, this was barely enough evidence to go before a jury.[2] Through the subsequent briefing and pruning of the case for trial, however, it appeared that Plaintiffs had no such evidence to present to the jury and Dr. Oliver's opinion was based on much speculation. This was the subject of a status conference with the parties on April 19, 2016.

---

[2] The Court ruled in its August 26, 2015 Opinion:

> Although the testimony by Plaintiffs' expert seems to support the conclusion that the 'culprit was in the clams' at the time of harvest, as Defendant argues, there are material disputes, i.e., the temperature of the water and presence of nutrients, . . . to put before a jury to resolve. If the jury concludes that the clams contained Vibrio in an amount less than the infective dosage level, then it may turn to the question of the impact of Windrift's conduct on the level of Vibrio in the clams and hence Plaintiff's risk of infection.

Aug. 26, 2015 Op. 48.

Thus, at oral argument this Court pressed Plaintiffs as to the evidence they intended to present through Dr. Oliver – or through other means - that the clams delivered to the Windrift more likely than not contained a non-infective dose of Vibrio. Under that theory, the Windrift's alleged mishandling would potentially be (if proven) the proximate cause through an increased risk of injury. Plaintiffs offered several arguments supporting the notion that they had sufficiently adduced evidence to make it a jury question. The Court addresses each of Plaintiffs' points below.

First, Plaintiffs contend that even without Dr. Oliver's testimony, the "evidence" that the State of New Jersey permitted harvesting of these clams could give rise to the inference that they did not contain an infective dose of Vibrio. In other words, per Plaintiffs, the State of New Jersey would never allow clam harvesting if the clams contained infective doses of Vibrio. Therefore, Plaintiffs contend, the possible inference is that they did not contain such infective dosages. This, however, is belied by the record, and indeed, by Dr. Oliver's own testimony:

> Q. Did you happen to review the defendant's answers to interrogatories indicating that there was a tag of a delivery that day, July 30th, from Sea-Lect Seafood? Did you happen to see that tag, sir?
>
> A. I may have. I don't recall it.

THE COURT: An illegal harvest is?

THE WITNESS: Well, the -- certain regions of estuarine environments, coastal environments, are set aside where it's allowed to harvest shellfish. They are leased to various seafood entities, seafood companies. They can be closed, for example, if there is a lot of runoff and maybe salmonella, E. coli from cattle, or something like that, contaminating the area. So periodically the shellfish areas might be closed. But typically a region is leased by a harvest company and then they have the right to harvest the shellfish there. So they are designated by the states where they can harvest.

THE COURT: And so the question that was asked, you don't have any information to believe that there was any harvesting done here that was not legal?

THE WITNESS: I have no knowledge of that, no.

BY MR. DE DONATO:

Q. And I believe, sir, in your expert report and your deposition you didn't bring up the fact there was anything but a legal harvest of shellfish here; is that correct?

A. I have nothing to indicate it was anything other than legal.

Q. Okay. Now, in the State of New Jersey is it legal to sell raw shellfish with vibrio if it's a legal harvest?

A. It's not possible, not -- would you say the question

again so I can try to answer it correctly?

Q. Okay. In New Jersey can raw shellfish from a legal harvest be sold with vibrio?

A. Yes.

Q. And you told us about an infective dose of 100 to 300 as the number you use; is that correct?

A. As an estimate, yes.

4

>Q. And there is no law in New Jersey that makes selling raw shellfish with an infective dose of 100 to 300 vibrio illegal; is that correct?
>
>A. No, that's correct.
>
>Q. In fact, you can legally sell raw shellfish in New Jersey with a hundred thousand vibrio in it; is that correct?
>
>A. To my knowledge no state has any regulations about what the numbers of vibrio must be, so you are correct.

Tr. of Proceedings of June 30, 2015 at 57:20-59:14 [ECF No. 83] (hereinafter, "Tr. at ___"). As both parties recognized, clams containing infective dosages of Vibrio are routinely harvested and sold to consumers.

Second, Plaintiffs contend that Dr. Oliver's testimony alone is sufficient to go before the jury because his opinion that the Windrift increased the risk of Vibrio infection and Plaintiffs' injury "logically" or "necessarily" presumes an underlying opinion that the clams delivered to the Windrift did not contain infective levels of Vibrio. Plaintiffs are mistaken. This is precisely why the Court held a Daubert hearing to ascertain under Rule 702 what evidence Dr. Oliver relied upon to reach his conclusions.[3]

---

[3] Again, by the slimmest of margins, this Court permitted Dr. Oliver to testify to the first prong, regarding whether the clams contained an infective dose of Vibrio, because it believed that Dr. Oliver's testimony was based upon facts that the Plaintiffs would introduce to the jury.

5

Dr. Oliver's opinion relating to the Windrift's proximate cause of Plaintiffs' injury must be tethered to "sufficient facts or data," and not presumption or supposition. Fed. R. Evid. 702(b). Rule 702 requires this. At oral argument Plaintiffs conceded that they could not introduce evidence of the very factors Dr. Oliver opined might be relevant, e.g., water temperature. Without that evidence, the record contains only an assumption – unconnected to facts in the record – that the clams did not contain infective Vibrio at the time of delivery. Even more to the point, disregarding what this Court saw as potential disputed facts that prevented this Court's entry of summary judgment, Plaintiffs' own witness, Dr. Oliver, opined that there was no way one could determine whether the clams had infective levels of Vibrio at the time of the delivery to the Windrift:

> Q. I'd like to talk about the infective dose. You told us earlier that all shellfish in estuarine waters would have a VV content; is that correct?
>
> A. That's virtually the case, yes.
>
> Q. And in some cases because of the valve pumping or the way these shellfish process their own nutrients there could be up to a hundred thousand vibrio organisms in any given shellfish, possibly more; is that right?
>
> A. That is possible, yes.
>
> Q. I'd like you to assume that from the interrogatories that are before the Court that the Windrift did take delivery of 50 choice neck clams on

the morning of Mrs. Horan's visit to the restaurant. I'd like you to assume those facts. You told us that there is no way of knowing the vibrio count of the three clams she ate upon delivery of those clams; is that correct?

A. Correct.

Q. They would have to be tested, which would destroy the clam; is that right?

A. That's correct.

Q. And is it correct that if she had -- if there was an infective dose it was created at the time of the harvest; is that correct?

A. If the clams had an infective dose?

Q. Correct.

A. That would be what a clam naturally has. Whatever is there, it is, I mean.

Q. So if there was 100,000 vibrio in the clam at the time of delivery, that was the infective dose; is that correct?

A. Which doesn't mean somebody would come down with it, but that –

Q. No.

A. -- that exceeds the number we believe that would be required.

Q. It would be within the range 100 to 300 vibrio organisms; is that correct?

A. I don't know what the question is, I'm sorry.

Q. You stated that you believe the infective dose is 100 to 300 vibrio organisms; is that correct?

A. I accept that number that's been supplied by other researchers, yes.

Q. Is it authoritative to you?

7

> A. Yes.
>
> Q. So if we use that number, on the morning of the delivery of the clams to the Windrift, if those clams were subsequently consumed by Ms. Horan, if one clam had a hundred thousand vibrio organisms, it's met the infective dose; is that correct?
>
> A. I would say that's correct.

Tr. at 64:20-66:17.  Indeed, Dr. Oliver testified that it would be pure speculation:

> Q. So my point to you, sir, is that with regard to the delivery that took place on the morning of her consumption of clams, we have no information as to the number of organisms that were delivered at the time to the Windrift; is that correct?
>
> A. That's correct.
>
> Q. There is no baseline from which you could calculate the number, the number of organisms to those delivered clams; is that correct?
>
> A. Correct.
>
> Q. And there is no way for you to calculate what the Windrift did, if anything, to increase an infective dose of clams that were delivered that morning; is that correct?
>
> MR. MAKOWICZ: In any of the particular clams?
>
> MR. DE DONATO: The ones delivered that morning, yes.
>
> MR. MAKOWICZ: That were served to Ms. Horan?
>
> MR. DE DONATO: Correct.
>
> THE WITNESS: To predict a number?
>
> BY MR. DE DONATO:
>
> Q. A number.
>
> A. No, you could not predict.

> Q. And that's because you don't have a baseline to begin with because there was no testing, is that a fair statement?
>
> A. Yes.
>
> Q. So if the – let me ask you this. If we take the Windrift out of the equation entirely, and Ms. Horan ate the clams without any involvement of the Windrift, those specific clams, would she have gotten sick anyway?
>
> A. I need to try and understand what you are asking me. If she just went out and got some clams on her own?
>
> Q. No, those specific clams. If we take the Windrift out of the equation and she ate those three clams before they were delivered to the Windrift, would she have gotten sick anyway?
>
> A. It's impossible to predict.
>
> Q. Why would that be?
>
> A. Because we don't know the number of VV that are in the clams.

Tr. at 67:3-68:11.

Moreover, in response to a question from the Court, Dr. Oliver conceded that Ms. Horan could have developed the infection without any involvement by the Defendant:

> THE COURT: So the question that's being asked by counsel is that if the batch were delivered and the Windrift – and Ms. Horan ate the clams from the batch, right then and there as they were delivered to the door of the Windrift, she could have developed this infection without any role by the Windrift.
>
> A. It is possible, yes.

Tr. at 70:9-15.

9

Dr. Oliver's testimony even went as far as discussing the issue of probability, and the foundation for his testimony that Ms. Horan's injury was caused by the Windrift:

> Q. Before we go on to another topic, I just wanted to go back to one other question I asked you. The question was if Ms. Horan had eaten the clams that were delivered on the morning of her meal without any involvement of the Windrift you said it was possible that she would have gotten sick. Is that correct?
>
> A. Correct.
>
> Q. Would it have been probable?
>
> A. I can't put a probability number on it. It's such a rare event that we don't know all the conditions that lead to the infection. As an example, she had eaten shellfish many times before with no consequence, probably when she had hemochromatosis then too, and we don't know why she didn't. That's a typical scenario of people who are susceptible, still eat many, many times and they have no consequence, and then eat one time and die. But we don't know what the combination is that results in that.
>
> Q. Well, then, do you know, what did the Windrift do after delivery of those clams to make it probable, as you answered Mr. Makowicz's question?
>
> A. Well, holding it at the wrong temperature, allowing the bacteria -- likely at a temperature that allowed the bacteria to increase in number, and the possibility of the likelihood of cross-contamination to result in either increases in number -- not so much that it was contaminated, but the fact that by sitting there for much longer than four hours at a temperature that allows proliferation of these bacteria, because they do grow so fast, and the possibility that the C types were increasing.
>
> Q. But again, this is -- this also is speculation; is that correct?
>
> A. Correct.

> Q. You don't have an answer other than to theoretically give us the response you just did; is that correct?
>
> A. I think that's accurate.

Tr. at 76:24-78:8.

Thus, Dr. Oliver's opinion that the unsanitary conditions at the Windrift increased the risk of Plaintiffs' injury is without any sufficient basis, but rather is built upon a working hypothesis or assumption only – an opinion that falls short of Rule 702.

Plaintiffs argue that this Court's ruling would mean that the Windrift would be free to let the clams sit out unrefrigerated for weeks and escape liability for any injury. Putting aside the fact that the hypothetical plaintiff's injuries would likely be caused by something other than just Vibrio, Plaintiffs' argument misses the point. If the cause of action is that Ms. Horan's injury – infection from Vibrio – was caused by the Windrift's conduct, Plaintiffs must first present sufficient and reliable evidence under Rule 702 or otherwise to go before a jury that the clams likely contained Vibrio in an amount less than the infective dose. Despite the opportunity to do so, Plaintiffs have presented no such evidence.

Plaintiffs' reliance on <u>Hake v. Manchester Township</u>, 98 N.J. 302 (1985) is misplaced for several reasons. First, <u>Hake</u> was one of the "narrow class[es] of cases of lost chance of

survival," id at 311, that imposed upon the defendant a duty to try to save the decedent's life.  Id.  "Tort claims based on 'lost chance' in terms of the causation of ultimate injury present unique conceptual and analytical problems not presented in other typical negligence cases."  Id. at 309.  This case is not a "lost chance" case.  Moreover, unlike in Hake, the opinions of Plaintiffs' expert witness, Dr. Oliver, are insufficient under Rule 702, for reasons set forth above.

In the end of the Court's final analysis, the Court is constrained to enter summary judgment in favor of Defendant. There remains no evidence to put before the jury that the clams delivered, more likely than not, did not contain an infective Vibrio.  This Court would be allowing mere speculation or supposition to go before the jury upon which "evidence" Dr. Oliver would opine that the Windrift's negligent handling of the clams substantially increased or proximately caused Plaintiffs' injuries.  Such opinion would be impermissible under Rule 702.

Accordingly, the Court will enter an Order granting summary judgment in favor of Defendant Windrift.

s/Renée Marie Bumb
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE

Dated: May 5, 2017